# TERRITORY OF HAWAII *v.* BENJAMIN HAYWARD WRIGHT.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED AUGUST 2, 1904.      DECIDED OCTOBER 4, 1904..

FREAR, C.J., HARTWELL AND HATCH, JJ.

EMBEZZLEMENT—*Chief clerk of department of public works.*

The defendant was appointed by the superintendent of public: works as chief clerk of the department of public works and clerk of the market, his duties as such clerk being prescribed by the superintendent, amongst them being the charge of public money received at the department, the salary for his office being appropriated by the legislature but no statute specifically authorized his appointment or placed him in charge of public money: *held* that the defendant was within the class of persons designated in section. 158, P. L., viz.: "Whoever, being a collector, cashier, clerk or other person employed in the Government Treasury, or in any other department of the Government, is guilty of embezzlement of any money, note, or other effects or property belonging to the Government."

OFFENSE OF EMBEZZLEMENT.

Defendant's receipt of $3,289.53 as chief clerk of the department of public works, receipted for by him as such clerk, his failure on demand to account for the money, offer to give his check for it, asking that the matter be kept quiet, his failure, when asked, to say what he had done with the money, and his concealment of it, not.

making any deposit of it in the official safe in the office, and failing
to pay it into the treasury, constitute in law the offense of embez-
zlement as defined in Sec. 157, P. L.

CONVERSION—*intent.*

> The foregoing acts and conduct of the defendant are evidence of
> his fraudulent conversion or disposition of the money to his own
> use and benefit or the use and benefit of another than the owner or
> person entitled thereto under Sec. 157, P. L.

DEFENDANT'S SUSPENSION—*evidence of.*

> A witness for the prosecution testified that the acting superin-
> tendent of public works told the defendant that he suspended him.
> The objection made by the defendant to the evidence that "conver-
> sations could not be shown until proof of embezzlement of some
> specific sum" did not sufficiently raise the question as to the rele-
> vancy of the evidence of the suspension of the defendant.

EVIDENCE—*of stub book, cash receipt book, and auxiliary book kept by
clerks in office of superintendent of public works.*

> A stub book of receipts, cash receipts, and auxiliary cash book
> kept by clerks in the department of public works under the defend-
> ant's supervision were admissible in evidence to show the method
> of transacting business in the office and that no entry was made in
> those books of the receipt of the money alleged to have been embez-
> zled; the audit act of 1898 not requiring that the Auditor General
> establish a uniform system of keeping public accounts, the absence
> of evidence that he had done so does not take from these books
> their character as public records.

CROSS-EXAMINATION—*of witness to defendant's signature.*

> Refusal of the court to allow a witness to the defendant's signa-
> ture to a receipt for money to be asked on cross-examination
> whether he had compared the writing with other writings of defend-
> ant held not to be prejudicial error, the defendant having substan-
> tially admitted the receipt of the money.


OPINION OF THE COURT BY HARTWELL, J.


The defendant was tried at the February Term, 1903, of the
First Circuit Court, De Bolt, J., presiding, upon an indictment
charging that on August 25, 1902, "and for two weeks next
thereto preceding, he, the said Benjamin Hayward Wright,
being then and there a clerk employed in the office of the Super-
intendent of Public Works, a department of the Territory of

Hawaii known as the Department of Public Works, as chief clerk and clerk of market, and by virtue of his said employment being a public accountant, charged with the duty of collecting and receiving revenue and other moneys on account of the said Territory of Hawaii, and he, the said Benjamin Hayward Wright, being then and there entrusted with and having the possession, control, custody and keeping, by virtue of his said employment, of a thing of value, to wit, certain money to the amount and of the aggregate value of three thousand two hundred and eighty-nine dollars and fifty-three cents ($3,289.53), a more particular description of which said money is to the grand jurors unknown, of the money and property of the said Territory of Hawaii, by the consent and authority of the said Territory of Hawaii; the said Benjamin Hayward Wright the said money then and there feloniously did embezzle and fraudulently convert and dispose of to his own use and benefit, without the consent and against the will of the said Territory of Hawaii, the owner thereof and entitled thereto, contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their official oaths aforesaid, do further say and present that the said Benjamin Hayward Wright of Honolulu, in the Island of Oahu in the First Circuit, at Honolulu, in the Island of Oahu, and in the circuit aforesaid and within the jurisdiction of this honorable court, on the 6th day of September in the year of our Lord one thousand nine hundred and two, and during six months next thereto preceding, he, the said Benjamin Hayward Wright, being then and there a clerk employed in the office of the Superintendent of Public Works, a department of the Territory of Hawaii known as the Department of Public Works, as chief clerk and clerk of market, and by virtue of his said employment being a public accountant, charged with the duty of collecting and receiving revenue and other moneys on account of the said Territory of Hawaii, and he, the said Benjamin Hayward Wright, being then and there entrusted with and having the possession, control, custody and keeping, by virtue of his said employment, of a thing of value, to wit, certain money to the amount and of the aggregate value of four thousand nine hun-

dred and eighty-two dollars and ten cents ($4,982.10), a more particular description of which said money is to the grand jurors unknown, of the money and property of the said Territory of Hawaii, by the consent and authority of the said Territory of Hawaii; the said Benjamin Hayward Wright the said money then and there feloniously did embezzle and fraudulently convert and dispose of to his own use and benefit, without the consent and against the will of the said Territory of Hawaii, the owner thereof and entitled thereto."

The verdict of the jury was that they found the defendant "guilty on first charge and not guilty on second charge."

The defendant's counsel excepted to the verdict as contrary to the law and evidence and weight of evidence and gave notice of motion for new trial. Thereupon the following remarks upon the form of the verdict were made:

THE COURT. Are you satisfied with the form of the verdict, Mr. Attorney-General; should it not be the "first count"?

MR. ANDREWS. It should be the "first count."

MR. DAVIS. I submit the verdict must be accepted as handed by the jury, and that no change can now take place after its announcement.

MR. ANDREWS. I think the verdict can be handed back for clerical change.

MR. DAVIS. I submit it is not clerical change. I submit the verdict must be received as delivered by the foreman of this jury.

THE COURT. The indictment, gentlemen of the jury, sets forth the charge in two counts.

THE FOREMAN (Mr. Black). We took the indictment on the first charge—the one of the note.

THE COURT. They are merely designated here as charges, it is true, and during the progress of the trial were spoken of as counts. The indictment does not designate them as counts, merely as the first and second charge.

This was clearly a verdict of guilty on the first count.

The defendant afterwards excepted to the denial of his motion for new trial.

Numerous exceptions were taken by the defendant at the trial, many of which frequently reappear and are repeated, in order, probably, to avoid the appearance of waiving an objection at any stage in the trial. All these exceptions are discussed and most of them are argued very elaborately in briefs of defendant's counsel, although in their oral argument they condensed and classified the contentions on which they said they relied, in substance as follows:

1. The employment of the defendant as chief clerk of the department of public works and of the market was not authorized or sanctioned by law, the defendant being merely the clerk of the superintendent of public works.

2. The defendant was not by authority or sanction of the law placed in charge of the public money which he is charged with having embezzled. It was the duty of the superintendent to take charge of that money, a duty which he could not delegate to the defendant.

3. There was no evidence that the defendant fraudulently converted the money to his own use. The evidence in the case authorizes the inference that he paid the money into the treasury in a deposit made two days after the date of the embezzlement alleged in the first count.

4. The prosecution ought not to have been allowed to show in evidence that the defendant had been suspended from his office by the acting superintendent of public works on the occasion of the discovery alleged to have been ascertained of the shortage in the defendant's accounts.

5. The stub book of receipts, cash receipt book and auxiliary cash book kept by the clerks in the department of public works ought not to have been received in evidence as public records, not having been kept upon a system authorized by the auditor general, and being nothing but hearsay evidence.

6. The defendant in cross-examination of the witness Siemsen, who had testified to the signature of the defendant to a receipt by him of $3,289.53 from the Hawaiian Electric Com-

pany, ought to have been allowed to ask the witness whether he had compared the alleged signature with any of the defendant's writings.

We can not concede the validity of the defendant's contention based on the claim that his employment as chief clerk of the department of public works and of the market was not authorized by law, and that no law authorized the entrusting him with the public money in question. The evidence shows that at the time of his alleged embezzlement he was employed in the alleged capacity, receiving his appointment from the superintendent, the legislature having made an appropriation for salary of chief clerk and clerk of the market, in its appropriations for the Department of Public Works.

The defendant on this showing was not an employe of the superintendent, but a Territorial employe within the class of persons designated in the statute under which he is indicted, which reads as follows:

"Whoever, being a minister, collector, cashier, clerk or other person employed in the government treasury, or any other branch of the department of finance, or in any other department of the Government, is guilty of embezzlement of any money, note, or other effects or property belonging to the Government, shall be punished by imprisonment at hard labor for life or any number of years, or by fine not exceeding five times the value of the thing or property embezzled." Sec. 158, P. L.

This statute does not require that in order that any person therein designated may commit the offense of embezzlement of public funds there shall be an express statute authorizing his employment in the capacity mentioned. The only thing which is required by the statute is that such person be *employed* in any department, whether as a "collector, cashier, clerk, or other person."

Nor does this statute require that in order that such designated person so employed be entrusted with or have possession of public money there shall be an express statute authorizing him to be entrusted with the money or to have possession of it. The following is the statute, viz.:

"If any person who is entrusted with, or has the possession, control, custody or keeping of a thing of value of another, by the consent or authority, direct or indirect, of such other, without the consent and against the will of the owner, fraudulently converts or disposes of the same, or attempts so to convert or dispose of the same, to his own use and benefit, or to the use and benefit of another than the owner or person entitled thereto, he is guilty of the embezlement of such thing." Sec. 157, P. L.

In *U. S. v. Hartwell,* 73 U. S. 386, cited in oral argument by defendant's counsel, the defendant was indicted for embezzling money while clerk in the office of a United States Assistant Treasurer. The indictment, in so far as it was based on the sixteenth section of the Sub-Treasury Act of 1846 was sustained. As stated in the minority opinion, "the clerks in the office of the assistant treasurer are, by the terms of this act, appointed by him alone, although by an act passed long since, and which can have no effect on the construction of this one, the assent of the secretary of the treasury is required. But they still derive their appointment from the assistant treasurer, and are removable at his pleasure. Their duties are prescribed by him, and he assigns each clerk to the performance of such functions as he may think proper. No act of Congress, nor any other law, confers upon these clerks any power or control over the public money. If they exercise such control, they get it from the assistant treasurer alone. They give no bond to the government, but the assistant treasurer may require them to indemnify him by bond, as is the rule in many large establishments. Their direct responsibility is to him." *Ib.* 399.

The minority opinion further says: "It may be also conceded that the defendant's position as clerk is an office provided for by statute, the salary of which is also fixed by a subsequent act of congress." *Ib.* 398.

The report of the case in Wallace's reports, 73 U. S. 385, contains an abridged statement of the argument of the defendant's counsel. A further statement appears in the Lawyer's Edition (18 L. E. 831), in which they are reported to have said that the defendant was appointed under the Act of July 23,

1866, 14 Stat. at Large, 202. The statute referred to appropriated money "for salaries of the clerks and messengers in the office of the assistant treasurer at Boston," and authorized the assistant treasurer "to appoint with the approbation of the secretary of the treasury" certain clerks with designated salaries. The defendant claimed that he was not an officer of the United States; that no statute prescribed his duties, but that he was merely a subordinate and assistant to the officer in charge, giving no bond and performing such services as he directs. *Ib.*

The case was thus stated by the court, viz.:

"Was the defendant an officer or person 'charged with the safe-keeping of the public money' within the meaning of the act? We think he was both.

"He was a public officer. The General Appropriation Act of July 23, 1866, authorized the assistant treasurer, at Boston, with the approbation of the Secretary of the Treasury, to appoint a specified number of clerks, who were to receive, respectively, the salaries thereby prescribed. The indictment avers the appointment of the defendant in the manner provided in the act.

"An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

"The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe."

The case above cited sustained our view that it was not requisite that in order to charge the defendant as a "clerk or other person employed in the department of public works", his custody of public money as such clerk should be expressly authorized by statute.

It is true that the U. S. Act of 1846 applies by its express terms to "officers and other persons charged by this act or any other act with the safe-keeping, transfer and disbursement of the public money." But we do not think that the absence of such

statutory provision is material since the common law makes any person who is entrusted with money liable for its proper application. The material question was whether the defendant was a territorial employee, or an employee of the superintendent. The section of the Penal Code under which in part the indictment was founded is broad enough to include, and we think that it does include any territorial employee of the class designated in that section who is in fact entrusted with the custody of public money.

The "consent or authority" of the territory for entrusting public money to the defendant while employed as the chief clerk of the department of public works may be either "direct or indirect."

The functions of the superintendent of public works are too extensive to permit him to remain constantly in his office so as to be the recipient and custodian of the large revenues constantly coming in there.

The legislature in providing in the Audit Act of 1898 for public accountants as recipients of public revenue either by law or by regulation or by appointment, must have contemplated appointments by heads of departments to meet precisely such conditions as above mentioned.

The following language of the court in the case cited is peculiarly appropriate to the present case, viz.:

"If the subordinates are not within the Act, there is no provision in the laws of the United States for their punishment in such cases. So far as those laws are concerned, they may commit any of the crimes specified with impunity. We think it clear that it was not the intention of Congress to leave an omission so wide and important in the Act, and our minds have been brought satisfactorily to the conclusion that they have not done so."

The defendant was a public accountant as described in Section 29 of the Audit Act of 1898, viz.:

"All persons who, by any law, regulation or appointment are now, or shall hereafter, be charged with the duty of collecting or

receiving revenue or other moneys on account of the Hawaiian Government, or with the duty of disbursing moneys on account of the public service, shall become and be 'Public Accountants', and shall perform all such duties and render such accounts as this Act prescribes, and as the Minister of Finance and Auditor-General shall from time to time direct."

There is no requirement of statute that the appointment to receive public money shall be explicitly provided for or author· ized by statute. The use in the section of the act above quoted of the words "by any law, regulation or appointment," implies that the regulation or appointment is something distinct from an appointment authorized by statute. The evidence that the superintendent placed the defendant in charge of the public money in the office is equivalent to appointing him to do so.

Cases are not in point which are cited for the defence, to the effect that there can be no *de facto* officers unless for an office which exists *de jure;* and that persons claiming to hold an office not authorized by law can perform no valid official acts. In *Norton v. Shelby County,* 118 U. S. 451, which is an instance of such cases, bonds issued by an unauthorized Board of the defendant county in payment of stock subscribed for by the Board were held to be invalid.

The defendant's counsel strenuously contended that the evidence does not sustain or justify the verdict or show that the defendant received the money and fraudulently converted it to his own use.

The evidence justifies findings as follows: that on August 16, 1902, the defendant, while employed as chief clerk of the department of public works and of the market, and by virtue of that employment and in no other capacity had possession by the consent or authority of the Territory of the sum of $3,289.53 belonging to the Territory, being money received by him on a check of the Hawaiian Electric Company, Limited, drawn on the Bank of Hawaii in favor of the department of public works, which check he that day cashed. That on September 9, 1902, at

the office of the superintendent of public works, in the presence of Attorney-General E. P. Dole, High Sheriff Brown, Acting Superintendent and Treasurer William H. Wright, Deputy Auditor Meyers, Siemsen and Cook, clerks in the department of public works, the defendant, being requested to open the combination safe in the office, after trying to open it, said he had forgotten the combination, ran to the telephone and rang up his attorney, Long, who soon after came, when the defendant opened the safe, and also unlocked and opened the inner drawer of the safe containing money. The deputy auditor counted the money in the defendant's presence and announced that there was $5,252.10 short in the accounts of the public works office; that at that time the check above mentioned was shown to the deputy auditor and then to the defendant, who asked the deputy auditor what it all amounted to, and being told that it was $8,541.63, and asked whether it was right, said that is about it. The defendant then said he would give his check for that amount. Dole asked him, "Will the check be paid?" He said he would require four days to raise the amount, and requested that the matter be kept quiet. To the question asked by the attorney general, "And what did you do with the money?" the defendant, upon the instruction of his attorney, made no answer. During a portion of the interview Cook, one of the clerks, went out and returned with the defendant's receipt to the Electric Company for the sum of $3,289.53, dated August 15, 1902, being the same sum for which the Electric Company's check had been drawn, dated August 15, 1902, payable to the Department of Public Works or order, which check is endorsed "Public Works paid, Aug. 16, 1902, per B. H. Wright, Chief Clerk."

On August 18, 1902, it appears by the evidence that the defendant deposited in the treasury of the Territory the sum of $11,379.14, with an accompanying statement signed and sworn to by him showing the sources from which that same money came, namely:

| | |
|---|---:|
| Excavator .........................$ | 658 40 |
| Rents ................................ | 7,278 26 |
| Realizations ......................... | 767 00 |
| Sewerage ............................ | 407 38 |
| Market ............................. | 1,181 60 |
| Weights and Measures ............... | 10 00 |
| Garbage ............................. | 1,076 50 |

$ 11,379 14

The defendant's counsel claim that this $11,379.14 might have included the $3,289.53 received by the defendant on the Electric Company's check, two days prior, on the theory that there may have been former deficiencies required to be made good by using the latter sum; but there is no basis for such theory. The defendant's sworn statement of the sources from which the larger sum was derived justifies a finding that he did not get any of it from the proceeds of the Electric Company's check.

The defendant's receipt of the said sum of $3,289.53 in his capacity as chief clerk of the department of public works, which was receipted for by him as chief clerk, his failure when called upon to do so to account for the money, his offer to give his check for that money, and for other public money admitted by him as a part of the shortage in the accounts of the public works office, his failure, when asked, to say what he had done with the money, his concealment of the money and his request that the matter be kept quiet, constitute in law the offense of embezzlement as defined by the statute. It is true that the defendant's fraudulent converting or disposing of this money "to his own use and benefit or to the use and benefit of another than its owner or the person thereto entitled" is not to be inferred from his having received the money and failed to pay it over to the Territorial treasurer; but the case shows more than a mere shortage of accounts; it shows that the defendant concealed the fact that he had received this money, and also concealed the money, the concealment consisting in his either retain-

ing it or placing it in some place which he declined when requested to mention, in not paying it into the treasury from the date of its receipt by him on August 16 until September 9 or at all nor keeping it in the official safe in which it was usual to deposit such money.   Not only the defendant did not account for the money when required to do so, or pay it to the person thereto entitled, namely, the treasurer, but after admitting its receipt, when asked what he had done with it, he would not say. The money being traced to his possession, was as effectually converted or disposed of by him to his own use and benefit, or to the use and benefit of some other than the person thereto entitled by his retaining it and when called upon to account for it by failure to produce it or to tell where it was, as if he had expended or invested the money, given it away or shared it with others.

"Evidence was given which tended to show that defendant concealed the facts as to the disposition made of some of the property, and that he rendered a false account of his agency in regard to it.   At least two witnesses testify to a demand for the property in controversy, made on the part of the company.   It is not shown that defendant complied with the demand, but it appears that he failed to do so."   *State v. Pierce,* 77 Ia. 249.

"The offense is sufficiently made out, within the meaning of the statute, if the jury are satisfied that the prisoner received in the aggregate the amount with which he appears to have charged himself, and that he absconded, or refused, when called upon to account, leaving a portion of the gross sum deficient." *Queen v. Lambert,* 2 Cox C. C. 310.

"If the defendant had, upon the demand of Ah Fook, returned him the money, as he might say that he had forgotten, or could not find the person, or did not care to take the trouble to deliver the money in China, it would not be held to be an embezzlement in China.   His failure to account for the money here to Ah Fook also makes it embezzlement."   *King v. Chock Hoon,* 5 Haw. 374.

"The usual evidence given of embezzlement is that, having received the money, the defendant denied the receipt of it, or did not account for it when he ought, or accounted for other moneys received by him at the same time or afterwards, and not for it, or rendered a false account, or practiced some other deceit, from which the jury may fairly infer that the defendant

either actually disposed of the money to his own use, or withheld it with intent to do so and to defraud the owner." *State v. Baumhager,* 28 Minn. 231.

*Reg. v. Lynch,* 6 Cox C. C. 445, is cited by defendant's counsel for the rule there stated by the court, that "receiving and not forthwith accounting for it (money) does not amount to embezzlement". But the court added: "You are to get from all the facts of the case, whether or not there has been an appropriation of the money. You may come to the conclusion from the lapse of time, that it was not a mere neglecting to account, but you have further the fact that, after getting this money, he absconded, and did not come back until he was in custody. You may infer that he intended to appropriate this money, and if so he is guilty of the crime with which he is charged." *Ib.* 446.

As to the defendant having intended fraudulently to convert or dispose of the money to his own use, "Every one shall be presumed to intend the natural and plainly probable consequences of his own acts." P. L., Section 14.

In *Prov. Govt. v. Gertz,* 9 Haw. 288, the defendant had imported certain cases of goods in which opium was found, "the presence of the opium there was wholly unexplained." The court said, "In view of these facts it seems to us to have been properly left to the jury to say whether there was an intent on the part of the defendant to import the opium," adding, "Where, as in this instance, the opium is shown to have been in a case of goods imported by the defendant, and no explanation of this fact in any way appears, and it does not appear that it was not in the power of the defendant to procure evidence exculpating himself, or that any attempt was made to procure such evidence, it seems to us that the court properly submitted the question to the jury to find whether, as an inference of fact, the opium was imported with the knowledge or consent of the defendant." *Ib.* 293.

The same question arose in *Rep. v. Anderson,* 10 *Ib.* 252, in which the court said, "While no inference prejudicial to one accused can be drawn from his neglect or refusal to give evidence

on his own behalf, yet where the evidence for the prosecution is such as to throw great suspicion upon him, his failure to produce or to endeavor to procure for production evidence which would explain his position or the facts casting suspicion upon him, when, so far as appears, it is within his power to do so, may properly be considered in passing upon the question of his guilt." *Ib.* 255.

While "intent is an essential ingredient of all crimes at the common law, in some offenses, the creatures of statute, it is not. Again in some instances the act by which the crime charged is committed is in and of itself evidence of a guilty knowledge or intent." N. 62 L. R. A. 226.

The same view is stated in *U. S. v. Harper,* 33 Fed. 481, in the following language: "Intent may be shown, or may be conclusively presumed, from the doing of the wrongful, fraudulent, and illegal acts, which in their necessary results naturally produce loss or injury to the association. The law presumes that every man intends the legitimate consequences of his acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proved to have been knowingly committed. This is the well settled rule which the law applies in both civil and criminal cases involving the question of intent. Human affairs could hardly be conducted, nor civil order be preserved, under any other. When the prohibited act is knowingly and intentionally done, and its natural and legitimate consequence is to produce injury to the association, or benefit to the wrong-doer, the intent to injure or defraud is thereby sufficiently established to cast on the accused the burden of showing that his purpose was lawful and his act legitimate."

The inference that one "intends the natural and plainly probable consequences" of his acts does not dispense with proof of the acts; but when defrauding another is a necessary or plainly probable result of the acts shown, the intent to defraud

is thereby also shown. In this case, the defendant's failure to dispose of the money as required by law, or to account for it when requested, was a breach of his duty at common law, as well as under the provisions of the Audit Act, the necessary result being that the Territory was defrauded of the money, a result which the law authorized the jury to regard the defendant as having intended.

The duties of the defendant as such public accountant are defined in Section 30 of the Audit Act, viz.:

"Every such public accountant collecting or receiving revenue or other moneys aforesaid in Honolulu shall pay weekly, or at such times as may be otherwise specially appointed, into the Treasury all sums of money collected or received by him on account of the revenue or otherwise as aforesaid, accompanied by vouchers bearing his signature, and which sum shall have been collected or received, and unless otherwise specifically directed, shall not later than the tenth day after the expiration of each month, transmit to the Auditor-General a return in the form contained in Schedule 'E,' hereto annexed with such particulars in each case as may be required by the Auditor-General, of all moneys collected or received by him during the preceding month, and shall make and subscribe to an oath in the form prescribed in this schedule."

We are of the opinion that the evidence justified a finding that the defendant received the money on the Electric Company's check and fraudulently converted or disposed of it to his own use and benefit or to the use and benefit of another than the Territory of Hawaii.

The defendant's counsel urged upon the court with much force that evidence ought not to have been given to the jury that the defendant had been suspended from his office, since it could show no fact tending to prove the defendant's guilt, and might have had a prejudicial effect upon the jury, citing particularly *Goodhue v. People,* 94 Ill. 307, a case which strongly supports counsel's view. But the record does not show that this particular evidence was objected to by the defendant or that any motion was made to rule it out. The witness Cook, placed upon the stand by the prosecution, was asked whether he heard "any

conversation between W. H. Wright and the defendant on Monday, the 8th." Defendant's counsel objected, that "Conversations are not admissible until they prove an embezzlement of some specific sum alleged in the indictment." The court asked if the prosecution wished to show by the witness what was said. and what occurred there, to which the attorney for the prosecution answered that he wished to show the suspension of the defendant on Monday, the 8th, by W. H. Wright, who was left. in charge of the department.

THE COURT. The defendant was present?

CATHCART. Yes.

THE COURT. Objection overruled.

DAVIS. Exception. (Page 40 transcript.)

The witness then went on to say that "W. H. Wright told the defendant he was suspended right then. There was nothing said and he went right out."

The question of the admissibility of this evidence on the ground that it was irrelevant was not raised or ruled on at the trial. The objection which was made to the evidence, namely, that conversations could not be shown until proof of "embezzlement of some specific sum" did not raise the question now presented.

It was after the foregoing objection was made that the witness testified as follows:

"Wright came in first, B. H. Wright, and he came in right after him, and he told me then that he just met Wright outside turning the corner of Hotel on a hack, and that is the reason he came right back; and he told him that he was suspended right then. There was nothing said and he went right out." (Pages 40-41 transcript.)

To the evidence thus given defendant took no exception and asked for no ruling in regard to it. This exception is therefore overruled.

As to the stub book, cash receipt book and auxiliary cash book kept by the clerks in the office, we think that they were properly admitted in evidence, not for the purpose of proving that the

defendant had embezzled the money, but to show the method of transacting business in the office, and that no entry was made in those books of the receipt of the money alleged to have been embezzled. The evidence shows that these books were kept under the direction and supervision of the defendant, who before he took the day's cash from the clerk who received it required a comparison to be made in his presence between the stub book and cash receipt book, to ascertain if they tallied. These two books are properly within the description of original, contemporaneous entries for the correctness of which the defendant made himself responsible by his control and supervision over them. As to the auxiliary cash book, which is merely a book in which the cash receipts shown by the stub book are grouped together according to subject matter as for instance for "rents", it was not objected to on the ground that it was not an original entry.

The general objection was made to all these books that they were not kept according to a system shown to have been established under the provisions of Section 10 of the Audit Act of 1898, viz.:

"The Auditor-General shall have power, with the approval of the Minister of Finance, to establish throughout all departments and bureaus of the Government a clear, methodical and uniform system of public accounting and to enforce the said system."

The exercise of this power to establish a uniform system of public accounting, is not made mandatary upon the Auditor-General. His failure to exercise the power does not take from the records which were kept in this case their character as public records.

The following extracts from the evidence on the subject of these books are made. The witness Siemsen testified for the prosecution (p. 19 transcript evidence) "that he had been employed as clerk in the office of the superintendent of public works since August 1, 1901, and was put in charge of the window, receiving and giving receipts out, and I was under the instructions of Mr. B. H. Wright", adding, "when people came

to the window to make payments I took the money and gave them receipts for it and at the close of the day, that is at 4 o'clock I would make out the cash statement and give it to Mr. Wright," (p. 20 *Ib.*) the receipts being taken from receipt books having stubs, concerning which the witness testified (p. 21 *Ib.*) "I filled out the stubs and filled out the receipts for the amount that was paid to me on whatever account it is paid for", turning the stubs over at the close of each day to the bookkeeper Manuel Cook, (p. 22 *Ib.*). The witness testified further as to these transactions as follows, viz.:

"Q.   And what would you do with the cash?

"A.   The cash I turned over to Mr. Wright.

"Q.   Now did you—did you just turn it over,—did you count it or do anything like that with it?

"A.   I counted it and made a cash statement; with this statement and the cash that comes to Mr. Wright and Mr. Wright goes over it and sees that it is correct before he puts it in his safe.

"Q.   What safe is it that you say that the defendant would put the money into when he received them from you?

"A.   In the safe that he had in charge.

"Q.   Did you have any access to that safe?

"A.   No sir.

"Q.   what would become of those statements of the cash on hand that you would turn—give to the defendant every evening?

"A.   He keeps it.

"Q.   And then what becomes of them?

"A.   I don't know; he puts it in his safe; he might destroy them; I don't know what he does with them.

"Q.   You have stated that in the afternoon of each day you would turn the cash over to the defendant with a statement of the amount on hand; did that happen every day?

"A.   No sir.

"Q.   What would be the disposition of it on some days and how did it come that that disposition would be made?

"A.   Some evenings I would get my cash statement ready and the cash ready to give it to Mr. Wright and he refused to take it.   He tells me to hold it over for the next day.

"Q.   Giving any reason?

"A.   The only reason that he gives is the safe ain't opened

and he says, 'I don't feel like opening my safe just now. Tomorrow we can make a settlement.'

"Q. Now what have you to say as to the disposition of the cash from—after the 22nd day of August of 1902 up to the 6th and including the 6th day of September, 1902?

"A. That is one of the instances where Mr. Wright told me to hold over the cash, and he kept putting it off until the day he was suspended.

"Q. What day was that?

"A. I guess on the 8th of September.

"Q. During that period of time from August 22nd to September 6th, where did you keep the money?

"A. In my private drawer.

"Q. And where was that?

"A. In the safe where we keep the books.

"Q. Who had access to this safe where you kept the books?

"A. I did.

"Q. Anyone else that you know of?

"A. No sir.

"Q. Only yourself?

"A. Yes sir.

"Q. When the cash wouldn't be turned over in the evening but would be kept by you by orders of the defendant until the day following, what would be done, what was eventually done with the cash? I am not speaking of the cash from August 22nd now, 1902, but before that time, when he would not receive it in the evenings?

"A. You mean when he makes a settlement?

"Q. Yes, how did he do; what would be done?

"A. Well, whenever Mr. Wright calls for the cash that I have I would turn it over, and him and I go over it and then it is verified with the bookkeeper's figures.

"Q. And what disposition would Mr. Wright—would the defendant make of the cash after he would receive it?

"A. Take it and put it in his safe.

"Q. You say the last time that the defendant took the cash was August 22nd, 1902?

"A. Yes sir." (pp. 26-27 *Ib.*)

In *White v. U. S.,* 164 U. S. 10, the court admitted entries kept by a jailer although not required by statute.

"It was not necessary that a statute of Alabama should provide for the keeping of such a book. A jailer of a county jail

is a public officer, and the book kept by him was one kept by him in his capacity as such officer and because he was required so to do.  Whether such duty was enjoined upon him by statute or by his superior officer in the performance of his official duty, is not material.  So long as he was discharging his public and official duty in keeping the book, it was sufficient.  The nature of the office would seem to require it.  In that case the entries are competent evidence."

For the considerations above expressed, the exception to the admission of the books in question is overruled.

The defendant excepted to the refusal of the court to allow in cross-examination of a witness to defendant's signature the question whether the witness had compared the alleged signature with other entries of the defendant.

The alleged signature was upon the check of the Hawaiian Electric Company and also upon a receipt to that company purporting to have been signed by defendant, and reading as follows:

"Honolulu, Aug. 15, 1902.

"Received of the Hawaiian Electric Co., Ltd., Thirty-two hundred eighty-nine and 53-100 Dollars.

"B. H. Wright,
"Chief Clerk."

The following extract from the transcript of evidence, pages 101, 102, shows what occurred:

"Mr. Cathcart.

"Q.  Mr. Siemsen, I show you Exhibit 17.  Mr. Siemsen, I ask you if you are familiar with the handwriting of the defendant B. H. Wright?"

"A.  I am.

"Q.  I ask you to look on the endorsement on that check and state whether or not it is—state whose the signature is?

"Mr. Davis.  If your Honor please, the mere fact that he simply asked the question, 'Are you familiar with the handwriting' and stops there, does not qualify a witness to answer. We want to know how he is familiar.

"The Court:

"Q.  How did you become familiar with his handwriting?

"A.  Well, I have seen him write quite often and I have seen him sign his signature quite often and seen him writing.

"The Court. That is sufficient. Now you can ask the question.

"Mr. Cathcart.

"Q. Whose signature is that?"

"A. Mr. Wright, B. H. Wright.

"Q. The defendant?

"A. Yes sir.

"Q. Look at the signature on the bottom of that voucher there. Can you state whose signature that is?

"A. B. H. Wright.

"Q. The defendant?

"A. Yes sir.

"Mr. Cathcart. I will offer it in evidence.

"Mr. Davis. I object. I want to cross-examine before it goes in.

"Q. Did you ever compare that; did you ever compare that writing with any writing of B. H. Wright's?

"Mr. Cathcart. I object to that as not cross-examination.

"The Court. Objection sustained.

"Mr. Davis. I except.

"Q. You didn't see B. H. Wright write that?

"A. No sir.

"Q. How many times have you seen him write?

"A. I don't know."

Cross-examination of the witness was continued at considerable length.

If the defendant's object in asking the question was to show that the witness was not qualified to testify whether the signature was genuine, the court could have allowed the question or not as in its discretion it thought fit. If his object was to test the correctness of the witness' evidence that the signature was that of the defendant the question was proper cross-examination. We cannot, however, say that its exclusion was prejudicial to the defendant or was reversible error, the defendant having substantially admitted the receipt of the money.

The following is the substance of other exceptions taken by the defendant namely:

On the evidence of the witness James H. Boyd called for the prosecution, defendant took eight exceptions, viz.: calling him

as witness he having been indicted as they said on the same matter; to his testifying as to the appointment he gave the defendant as chief clerk and his appointment as clerk of the market and his reading the appointments himself instead of having the clerk of the court read them; to his testifying what the defendant's duties were; to refusal to strike out his evidence that the defendant kept the cash in the office in a safe and there was a combination safe there of which the defendant had the combination and that he pointed out his duties in the office to the defendant.

In the evidence of Siemsen, the second witness for the prosecution, the defendant took seven exceptions, namely:

To the evidence that the witness was in charge of the window at the office, receiving money and giving receipts and under defendant's instructions, and that defendant told him of his duties in regard to receiving money; that witness kept a stub book of receipts turning the cash regularly over to the defendant each day, that on days that the defendant did not care to open the safe witness locked it up in his own drawer; to the witness using memoranda to refresh his memory as to the amount of cash that he had on hand on the day that the defendant opened the safe; to his evidence concerning interview between the defendant and the other officials already referred to.

In the evidence of Cook, the third witness for the prosecution, defendant took thirteen exceptions, namely:

To the witness testifying concerning the conversation between defendant and W. H. Wright already alluded to; to the defendant sealing the combination safe; to witness testifying concerning a cash receipt book kept by him in the office called an auxiliary book and to the introduction of the book in evidence; to his showing the cash balance called for by the books September 1, 1902, or filing a statement taken from the books which was passed over to the treasurer according to the practice every month which statement dated September 2, 1902, signed by the defendant, showed "Receipts Department of Public Works for the Month ending August 31, 1902"; to the witness testifying

that there was no entry in the auxiliary book of any money received from August 1 up to and including September 8, 1902, from the Hawaiian Electric Company; to the refusal of the court to allow the defendant in cross-examining this witness to ask him, if he knew whether the defendant took any oath of office, or gave any bond.

In the evidence of Meyers, deputy auditor, for the prosecution there were five exceptions taken by the defendant, namely:

To the witness testifying whether he had authorized any sets of books to be kept in the office of the Superintendent of Public Works; and whether a system of keeping them was approved by the treasurer and his testimony on that subject; to his testifying concerning the last schedule filed in his office by the defendant, showing statement of receipts and to the introduction in evidence of the schedule referred to.

In the evidence of White for the prosecution defendant excepted to his testimony concerning a contract between a former Minister of Interior and the Hawaiian Electric Company, Limited.

Defendant excepted to the evidence of Gartley for the prosecution that the check already referred to was drawn in payment of a royalty on cash receipts for light and power for one year to June 1, 1901, under the contract above mentioned.

Siemsen being recalled by the prosecution, eight exceptions were taken by the defendant in his evidence, namely:

The exception already referred to about cross-examining this witness to defendant's handwriting; to the introduction of the voucher and check signed by the defendant as testified by the witness; to the witness testifying that the defendant had not turned over to him any money collected from the Hawaiian Electric Company at any time after August 1.

Defendant excepted to the refusal of the court to instruct the jury to find a verdict of not guilty on the grounds that there was no evidence of embezzlement and also that the statute on which the prosecution is based "permits imprisonment for life and involves a cruel, unusual, unreasonable and excessive pun-

ishment." The sentence was imprisonment at hard labor for three years with costs.

None of the above exceptions can be sustained; although discussed at considerable length in their brief, defendant's counsel did not, except as herein mentioned, rely upon them in oral argument. No error appears in the instructions to which the defendant excepted, or in the refusal to give those which were asked and not given. The motion for a new trial was properly denied.

Exceptions overruled, and case remanded to the First Circuit Court.

*L. Andrews, Attorney-General, Cathcart & Milverton* for prosecution.

*J. J. Dunne, G. A. Davis* and *Smith & Lewis* for defendant.