## TERRITORY *v.* JAMES P. AWANA.

## No. 1610.

EXCEPTIONS FROM CIRCUIT COURT FIRST CIRCUIT.
HON. J. J. BANKS, JUDGE.

ARGUED JUNE 10, 1925.                    DECIDED AUGUST 22, 1925.

PETERS, C. J., PERRY AND LINDSAY, JJ.

CRIMINAL LAW—*evidence—other offenses.*

Evidence of other crimes similar to that charged is relevant and admissible when it shows or tends to show a particular criminal intent which is necessary to constitute the crime charged. That this evidence incidentally proves independent crimes is immaterial.

EMBEZZLEMENT—*elements of appeal—intent.*

R. L. 1925, ss. 1491 and 1492, are broad enough to cover embezzlement by a public officer. A fraudulent intent is an essential ingredient of the crime of embezzlement as defined by R. L. 1925, s. 4191.

CRIMINAL LAW—*evidence—other offenses—degree of proof of.*

Evidence of other crimes similar to that charged need not of itself show the guilt of a defendant of the commission of such offenses beyond all reasonable doubt. It is sufficient if such evidence tends to prove the defendant guilty of the commission of such other offenses.

INDICTMENTS AND INFORMATIONS—*statement of offense—intent.*

Where a statute defining a criminal offense is silent as to intent, but the act made criminal imports a criminal intent, an allegation of such intent is unnecessary.

CRIMINAL LAW—*evidence—weight and sufficiency.*

Evidence held to be sufficient to sustain verdict.

SAME—*instructions—harmless error.*

An instruction to the effect that the jury may in determining the degree of credibility to be attached to the evidence of the defendant take into consideration his interest in the result of the prosecution, if contrary to the prohibitions contained in R. L. 1925, s. 2426, and error, is not prejudicial error entitling the defendant to a new trial where as here the defendant had no defense and the evidence leaves no reasonable doubt of his guilt.

OPINION OF THE COURT BY PETERS, C. J.

(Perry, J., dissenting.)

The defendant was convicted of the crime of embezzlement. His exceptions include the following assignments of error: (1) That evidence of similar offenses was improperly admitted for the reasons (a) that a criminal intent is not a necessary ingredient of the offense charged in the indictment and (b) that the evidence did not show beyond a reasonable doubt that the defendant was guilty of other offenses similar to that charged; (2) that if a criminal intent is a necessary ingredient of the offense charged the indictment is fatally defective in that it fails to allege such criminal intent; (3) that the verdict is contrary to the evidence; (4) that the court in its instructions to the jury commented upon the weight and credibility of the evidence of the defendant.

(1a) The indictment charged that on the 13th day of August, 1923, the defendant being then and there an employee of the City and County of Honolulu, a municipal corporation, to wit, a clerk of the Honolulu water works and the sewer works department of the said city and county, and by appointment and employment charged and entrusted with the safe-keeping, transfer and disbursement and having the possession, control and custody of certain moneys belonging to said City and County of Honolulu, to wit, the sum of $77.35, by the consent and authority of said city and county, without the consent and against the will of the said city and county, the owner thereof and entitled thereto, the said moneys then and there feloniously did embezzle and fraudulently convert and dispose of to his own use and benefit..

Evidence of other crimes similar to that charged is relevant and admissible when it shows or tends to show a particular criminal intent which is necessary to constitute the crime charged. That this evidence incidentally proves independent crimes is immaterial. (16 C. J., title

"Criminal Law," §1137; *Territory* v. *Chong Pang Yet,* 27 Haw. 693, 695.) Where a fraudulent intent is an essential ingredient of the crime of embezzlement the rule admitting evidence of other crimes similar to that charged tending to show a fraudulent intent is peculiarly applicable. (16 C. J., title "Criminal Law," §1159.) The defendant contends that the offense of which he was indicted is that defined by R. L. 1925, s. 4192, and that the mere conversion to his own use by a public officer or other person charged by law, regulation or appointment with the safe-keeping, transfer or disbursement of property belonging to a municipal corporation constitutes embezzlement and that no fraudulent intent is necessary.

Whether a fraudulent intent is a necessary ingredient of the offense of embezzlement defined by R. L. 1925, s. 4192, we deem unnecessary to decide. From the wording of the indictment it is apparent that the defendant was indicted of the offense of embezzlement as that offense is defined by R. L. 1925, s. 4191. This section has been held by this court to be broad enough to cover embezzlement by a public officer. (*Territory* v. *Wright,* 16 Haw. 123, 131, followed with approval in *Territory* v. *Clark,* 20 Haw. 391, 394.) R. L. 1925, s. 4191, defining the offense, and s. 4192, fixing the punishment, amply support the indictment in this case. That the defendant might also have been indicted under R. L. 1925, s. 4192, is no defense to an indictment under R. L. 1925, s. 4191. It is no defense to an indictment under one statute that the defendant might also be punished under another. (*Ex parte Converse,* 137 U. S. 624.) If, as the defendant contends, a fraudulent intent is not a necessary ingredient of the crime of embezzlement as defined by R. L. 1925, s. 4192, then in indicting this defendant under s. 4191 the prosecution assumed an additional

burden of which certainly this defendant cannot complain.

A fraudulent intent is an essential ingredient of the crime of embezzlement as defined by R. L. 1925, s. 4191. The gravamen of the offense as there defined is not the mere fraudulent conversion of the property of another to one's own use or to the use of another not entitled thereto. The word "fraudulent" in connection with the word "conversion" relates specifically to the fraudulent intent with which the conversion is committed. (*State v. Patterson,* 71 Pac. (Kans.) 860, 861.) The word "embezzle" and the words "fraudulently convert to one's own use or the use of another not entitled thereto" mean the same thing. (*Spalding v. People,* 49 N. E. (Ill.) 993, 998.) The effect of the word "fraudulently" in connection with "converts and disposes of the same * * * to his own use and benefit or to the use and benefit of another than the owner or person entitled thereto" has never been directly passed upon by this court. Doubtless the plain import of the words employed in the statute has rendered their interpretation unnecessary. In the *Wright* case, *supra,* however, it was contended by the defendant that the evidence did not sustain a finding that the defendant fraudulently converted money to his own use and the court there said: "* * * the necessary result being that the Territory was defrauded of the money, a result which the law authorized the jury to regard the defendant as having intended." A fraudulent intent being a necessary ingredient of embezzlement as defined by R. L. 1925, s. 4191, evidence of other crimes similar to the one charged, committed at or about the same time, was relevant and admissible to show that the alleged conversion by the defendant was committed fraudulently.

(1b) Defendant contends that the evidence adduced

in support of other prior similar offenses did not of itself show beyond all reasonable doubt that the defendant was guilty of such offense and hence should not have been submitted to the jury. He cites in support of his contention *Baxter* v. *State*, 110 N. E. (Ohio) 456. This case, however, is not persuasive. We prefer the reasoning and the rule enunciated in *Commonwealth* v. *Robinson*, 16 N. E. (Mass.) 452, approved and followed in *State* v. *Hyde*, 136 S. W. (Mo.) 316, to the effect that the evidence of other crimes similar to that charged need only tend to prove the defendant guilty of such other crimes. The degree of proof required of the prosecution to entitle it to a conviction applies to the offense charged and every essential ingredient thereof. One of the essential ingredients of the embezzlement as charged was a fraudulent intent. Hence the fraudulent intent must be proved beyond all reasonable doubt. It does not follow that a collateral matter from which intent may be inferred must also be proved beyond all reasonable doubt. To require such a degree of certainty would be unreasonable and cast a burden upon the prosecution in excess of what the protection of persons accused of crime requires. As we shall hereafter more fully point out in connection with the exception to the verdict, the evidence tended to show similar embezzlements by this defendant within a short time prior to the embezzlement charged in the indictment. This evidence was competent and material and its admission was not error.

(2) Where a statute defining a criminal offense is silent as to intent but the act made criminal imports a criminal intent an allegation of such intent is unnecessary. R. L. 1925, s. 4191, does not make intent affirmatively or descriptively an element of the crime of embezzlement. Hence unless the act condemned without such averment would otherwise be innocent or indifferent it

need not be alleged. The act made criminal is the fraudulent conversion of the property of another to one's own use or benefit or to the use and benefit of another than the owner or person entitled thereto. The indictment alleges a felonious and fraudulent conversion and disposition by the defendant to his own use and benefit. As already pointed out, the word "fraudulent" in connection with the word "conversion" relates specifically to the fraudulent intent with which the conversion is committed. "Feloniously" is equivalent to "purposely" or "unlawfully." (*State* v. *Bush,* 27 Pac. (Kans.) 834; *Commonwealth* v. *Adams,* 127 Mass. 15, 17.) "The information alleged that the defendant 'did then and there unlawfully, feloniously and fraudulently embezzle and convert to his own use' the money of the city, and it is asserted that this is an insufficient charge of wrongful intent. The allegation includes evil intent. The word 'fraudulently' relates specifically to appellant's intent in converting the city's money to his own use, and the word 'embezzle' itself excludes honesty. It is not necessary to allege that the money was embezzled and converted with the intention to embezzle and convert the same, and it could not be embezzled and converted innocently if done fraudulently. * * * The statute not having added in specific words an intent to defraud to the description of the crime, and having left such intent to be derived from the words 'embezzle and convert to his own use,' intent to defraud need not be averred in specific words." *State* v. *Patterson, supra.* See also *State* v. *Trolson,* 32 Pac. (Nev.) 930, 932; *Reynolds* v. *State,* 47 Atl. (N. J.) 644. The indictment is amply sufficient to inform the defendant of the nature and cause of the accusation against him.

(3) The verdict is sustained by the evidence. The Honolulu water works and sewer works department is

a department of the City and County of Honolulu charged with the duty of collecting municipal water rates. Consumers are charged for water used either upon a flat rate or upon meter measurement. Water rates if calculated upon meter measurement are due and payable at the office of the department on the first days of March, June, September and December of each year, for the term of which the charge is made. If calculated upon a flat rate they are due and payable at the office half-yearly in advance on the first days of January and July of each year for the period of six months following such dates respectively. Consumers are identified upon the records of the department by name, residence and privilege number. The receipts for water rates are made up in the following manner: The department secures in advance loose-leaf sheets printed in blank measuring four inches by thirteen inches, with two vertical perforations across their greatest length, the first marking a 1½ inch margin suitable for binding purposes and the second a five-inch stub. The remainder of the sheet is the receipt proper. Two holes are punched at the top of each stub to admit of subsequent filing. Receipts for meter rates and those for flat rates are distinguished by color. The receipts and stubs for flat rates both bear the following printed matter:

"Dr. to HONOLULU WATER WORKS"

(Space for name of consumer, address and privilege number)

| | | |
|---|---|---|
| "*6 Mos. Advance Rate to*" (date of termination of period) | "$............ | ....... |
| *10% Penalty* | $............ | ....... |
| *Back Rate Unpaid to*" (date of beginning of period) | "$............ | ....... |
| *10% Penalty* | $............ | ....... |
| *Total,* | $............ | ....... |

*Stub No.* ...................."

The receipt for the meter rates bears the following printing:

"Dr. to HONOLULU WATER WORKS"
(Space for name of consumer, address and privilege number)

"Receipt for *Water Service by Meter Measurement:—*
*From*" (date) "*to*" (date)

| | GALLONS | CUBIC FEET |
|---|---|---|
| *Present Reading* | \| \| \| \| o\|o\|o | \| \| \| \| \| o\|o |
| *Last* " | \| \| \| o\|o\|o | \| \| \| \| o\|o |
| *Consumption* | \| \| \| o\|o\|o OR | \| \| \| \| o\|o |
| *At 10 Cents per M.* | \| \| \| . o\|o\|o $ | |
| " 5 " " " | \| \| \| o\|o\|o $ | |
| *Total* | $ | |
| *10% Penalty* | $ | |
| *Unpaid rate* | $ | |
| *10% Penalty* | $ | |
| | $ | |
| *Total amount due* | $ | |

*Stub No.* _____ "

The stub of meter rates bears the following printing:
(Space for name of consumer, address, privilege number)

"*METER RATE RECEIPT*
*From*" (date) "*to*" (date)          "$_____ _____
          *10% Penalty* _____ $_____ _____
          *Unpaid Rate* _____ $_____ _____
          *10% Penalty* _____ $_____ _____
          _____ $_____ _____
          *Total Amount Due* _____ $_____ _____
                    *Stub No.* _____ "

With the use of an addressograph a clerk in the department completes the receipt and stub of each consumer by inserting in the spaces reserved for that purpose the name, address and privilege number of the consumer and entering after the appropriate printed matter the current rate; the 10% penalty, if any; the back rate unpaid, if any, and the penalty of the latter.

When thus completed each receipt and stub shows the state of the account of the consumer upon the date when the rate is due and payable. These loose-leaf sheets, thus completed, with the exception of those reflecting the accounts with the federal and territorial governments and shippers, are then bound into volumes of 300 pages each in numerical order of privilege number, flat-rate sheets and meter-rate sheets being bound separately. Those excepted are retained in loose-leaf form in numerical order. Water furnished shippers is invoiced and payments numbered. These bound volumes of receipts and stubs for all practical purposes constitute the current records of the department. Whatever receipts remain after due date constitute the delinquent consumers and they are used in noting delinquencies and penalties when the receipts and stubs for the ensuing period are prepared. When a consumer pays his bill the receipt prepared for him with the stub is removed from the bound volume and stamped with a numbering machine with the next ensuing stub number. Shippers are given independent receipts and the payments identified in the records of the department by a shipper's stub number. The federal government pays its bills monthly and due to its requirement that its receipts be executed in triplicate the department paying the bill furnishes its own receipt and the payment is recorded on the stub file by using an extra blank stub. The stub-number stamp executes singly, in duplicate, triplicate and quadruplicate, accordingly as it is set, and the receipt and stub receive the same number. Both stub and receipt are signed with the following payment stamp, which automatically records the date and hour of its use: "Received Payment" (month, day, hour, year) "Honolulu Water Works Per .................." The regulations of the department require that the clerk receiving the money

initial this stamp. The defendant's identifying initial was the letter "A;" that of the chief clerk, Dan Pahu, the letter "P." The stubs are filed on a filing device consisting of two metal posts. Receipts of water rates are entered upon a cash book and posted on ledger cards. Each consumer has an individual ledger card bearing his name, address and privilege number. All rates paid are supposed to be entered in the cash book in numerical order of stub number and posted in the consumers' respective ledger cards. The cash book is ruled to correspond with the items of receipts, having columns for date, privilege number, stub number, rate and 10% penalty of meter current period, rate and 10% of meter back periods, rate and 10% penalty of flat rate current period, rate and 10% of flat rate back periods, shipping, labor and material, general realizations, total and amount deposited in the city and county treasury. The stub numbers of receipts for water rates are entered in the cash book with an automatic numbering machine similar in character to that used for entering the stub number on receipts and stubs. All other entries in the cash book are in manuscript. Meter rate consumers' ledger cards have appropriate places for entry of privilege number, name of consumer and location, and columns for date, reading, consumption, minimum and additional rates, amount, 10% penalty, labor and material, total due, the date paid and stub number. The flat rate consumers' ledger cards have appropriate places for entry of privilege number, annual rate, name of consumer, location, and columns for date, six months' rate in advance, 10% penalty, labor and material, total due, date paid and stub number. All entries on ledger cards are in manuscript. Dates are uniformly abbreviated by using the number of the month, the day and the last two figures of the year, each separated by oblique lines. The stubs

of receipts are retained upon the files upon which they are originally placed until checked by the auditor of the city and county when they are tied in bundles and put away. There are three similar number stamping machines in use in the water works department. The defendant at the time alleged in the indictment was a clerk employed in the Honolulu water works and sewer works department of the City and County of Honolulu. His duty was to keep the cash book and with others collect and receipt for water rates paid at the office of the department. It was also his duty to post receipts of water rates on the consumers' ledger cards, of which he had charge. Other clerks also posted receipts on the ledger cards. The defendant had complete charge of invoices for water supplied by the department to shipping and receipts prepared in advance to be delivered upon rates paid by the federal and territorial governments and the City and County of Honolulu.

The indictment charges the embezzlement of $77.35 on August 13, 1923. According to the theory of the prosecution this amount was received by the defendant on that day from one K. Kuwada, residing at 965 King street, Honolulu, whose privilege number was 3600. K. Kuwada was not produced as a witness. The prosecution produced a receipt of the Honolulu water works issued to K. Kuwada, 965 King street, Honolulu, privilege number 3600, for water service by meter measurement, February 7, 1923, to May 7, 1923, in a total amount of $77.35, bearing the stamped stub number of "7472," repeated in lead pencil in the handwriting of the defendant, and the following payment stamp: "Received Payment Aug 13 9-17 AM 1923 Honolulu Water Works Per A." Lead pencil corrections were made in the bill by crossing out one item and totaling the amount due. This is in the handwriting of the defendant. The cash

book of the Honolulu water works neither under date
of August 13, 1923, nor any other date contains any
entry of the receipt of this $77.35. It does contain, how-
ever, under date of August 11, 1923, in the handwriting
of the defendant, an entry of the receipt of $5 upon privi-
lege number 11414, stub number 7472. The ledger card
of K. Kuwada contains an entry of the receipt on August
11, 1923, of $77.35 upon stub number 7405. Privilege
number 11414 was not that of K. Kuwada. One witness
testified that the date and stub number were in the
handwriting of the defendant; another that all of the
entries were in his handwriting. In this connection
there was produced from the records of the department
a stub bearing in typewriting the name, address and
privilege number of "J. O. Carlson 810 8th Ave. 11414"
for a flat rate of six months' advance rate to December
31, 1923, in the sum of $5 and bearing the following
receipt stamp: "Received Payment Aug 13 12-14 PM
1923 Honolulu Water Works Per A" and the stub num-
ber stamped "7472." There was also produced from the
consumer a receipt, at the head of which appeared
"J. O. Carlson 810 8th Ave. 11414," the name stricken
out and the name of Henry Aguiar substituted, for
six months' advance rate to December 31, 1923, in the
sum of $5 and bearing the same payment stamp and
initial "A" as the stub last referred to. The receipt,
however, bore no stub number. The ledger card of
privilege number 11414 bears no name nor address but
there is entered thereon under date of August 13, 1923,
the receipt of $5 upon stub number 7472. These entries
are in the handwriting of the defendant. In the cash
book of the Honolulu water works under date of Au-
gust 6, 1923, is an entry in the handwriting of the de-
fendant of the receipt of $2.90, flat rate current period,
and $3, labor and material, upon stub number 7405,

privilege number 11471. Stub number 7405 is the same stub number that was entered in the ledger card of K. Kuwada in connection with the entry of the receipt of $77.35. Privilege number 11471, however, was that of Annie Kauwe, address "Minton Tract." A stub was produced from the water works department in the handwriting of the defendant including the name, address and privilege number, bearing the stub-number stamp of 7405, and the payment stamp of "Aug 6 8-38 AM 1923." This stamp is not initialed. The ledger card of Annie Kauwe contains the entry in the handwriting of the defendant under date of August 6, 1923, of the sum of $5.90, stub number 7405. All entries in the cash book of the department under dates of August 13, 1923 (28 items in all); August 11, 1923 (24 items in all), and August 6, 1923 (47 items in all), are in the handwriting of the defendant except the stamped stub numbers. According to the cash book the total receipts of the Honolulu water works on August 13, 1923, were $885.88. A duplicate deposit slip in the handwriting of the defendant shows that that amount was under his direction deposited on that day in the treasury of the City and County of Honolulu. There were also produced the remaining stubs issued on August 13, 1923. They with stub numbered 7472 correspond with the entries in the cash book for that day. The first stub bears the number "7470" and the payment stamp is "Aug 13 11-30 AM 1923." The "13" in the date had been changed from "11." The 11th was a Saturday and the stub apparently was carried over to the following Monday, the 13th. The payment stamp on the next stub (7471) bears the hour of 8:43 A. M.; the next (7473) 9:23 A. M. Stub number 7482 is stamped 11:16 A. M.; number 7473, 12:51 P. M. The lunch hour of the defendant was from 11 to 12. Prior and subsequent to indictment of the

defendant, while an expert accountant was investigating the affairs of the department and questioning the employees therein in respect to the records thereof, the defendant upon several occasions cautioned a fellow-employee who had not been in any way connected with the bookkeeping work of the department not to commit himself if questioned by the expert as to the identity of handwriting contained in the records of the department.

The prosecution offered evidence of prior similar offenses. One was in connection with meter rates of $38.50 paid by the territorial normal school dormitories, privilege number 1016. The medium of payment was a check on the First National Bank of Hawaii, dated August 2, 1923, payable to the order of Honolulu water works. This check bears the following indorsements: "For deposit with the Treasurer, City & County of Honolulu to the credit of Honolulu Water Works Department;" "Deposited for credit of City & County of Honolulu D. L. Conkling, Treasurer;" "Pay to the order of yourselves Aug 14 1923 The Bank of Hawaii Ltd. R. McCorriston Cashier." (The Bank of Hawaii evidently was the city and county depositary.) It was perforated: "Paid 8 15 23" The ledger card of the territorial normal school dormitories contains a credit entry of $38.50 under date of August 13, 1923, stub number 7426, all in the handwriting of the defendant. The cash book of the department contains no entry on August 13, 1923, or at all, of $38.50. It does contain, however, in the handwriting of the defendant, an entry under date of August 6, 1923, in connection with stub number 7426, privilege number 11456, of $3.75 for flat rate current period, and $3 labor and material. The records of the department do not contain any stub reflecting the receipt by it of $38.50 from the territorial

normal school dormitories. The records do contain, however, a stub bearing stub number 7426 in the handwriting of the defendant, including the name, address and privilege number "S. H. Kui Leilani 11456," showing the items of $3.75 for flat rate to December 31, 1923, and $3 for labor. The date of the payment stamp thereon is "Aug 6 11-00 AM 1923." The consumer produced his receipt. It contains in the handwriting of the defendant the same name, address and privilege number and bears the same stub number, date and hour of receipt as the stub. The payment stamp has the initial "A." All of the entries in the cash book of the department under dates of August 13, 1923 (28 items in all), and August 6, 1923 (47 items in all), are in the handwriting of the defendant with the exception of the stamped stub numbers. Another instance is the case of Y. Ahin, privilege number 6576. The ledger card of Y. Ahin contains in the handwriting of the defendant an entry under date of April 16, 1923, of the receipt of $68.95 upon stub number 9714. The cash book of the department does not contain any entry under date of April 16, 1923, or at any other time, of the receipt of $68.95. Under date of April 14, 1923, however, the cash book contains an entry in the handwriting of the defendant of the receipt of $10 current meter rate and $1 penalty in connection with stub number 9714, privilege number 6120. The records of the department do not contain a stub reflecting the receipt of $68.95 paid by Y. Ahin. The consumer produced his receipt, however. All written matter therein is in the handwriting of the defendant. The payment stamp thereon bears the date of "Apr 16 2-34 PM 1923" and is initialed by the letter "A." Stub number 9714, produced from the records of the department, refers to a receipt given to D. H. Benton, 550 Circle Lane, Honolulu, privilege number 6120. The pay-

ment stamp is initialed "P" and the date "16" is changed to "17" in ink. The manuscript contained in this stub appears to be in the handwriting of the defendant. All of the entries in the cash book under date of April 16, 1923 (20 items in all), are in the handwriting of the defendant with the exception of the stamped stub numbers. Another instance is that of the United States fort situated at Kaimuki, known as Fort Rueger, privilege number 4564. Fort Rueger's ledger card contains entries in the handwriting of the defendant of three receipts, namely, $237.87 on April 24, 1923, upon stub number 9784; $237.80 on May 25, 1923, upon stub number 9997, and $237.87 on August 6, 1923, upon stub number 7407. The cash book of the department does not contain any entries of the receipt of these amounts upon the dates mentioned, or at all. Nor do the records of the department contain stubs reflecting such receipts. There appear in the cash book of the department, however, under date of April 24, 1923, the receipt of $151.65 for current meter rate in connection with stub number 9784, privilege number 1426, and under date of May 25, 1923, an item of $4.20, current meter rate in connection with stub number 9997, privilege number 7473, and under date of August 6, 1923, in connection with stub number 7407, privilege number 10518, an item of $5.70, flat current rate and $9.25 flat back rate, and $3 labor and material in connection with stub number 7407, privilege number 10518. Stub number 9784 upon privilege number 1426, produced from the records of the department, and the receipt itself, produced from the consumer, tally in respect to the period covered and the amount charged. The receipt, however, bears no stub number and the payment stamp while bearing the date and hour "Apr 24 9-15 AM 1923" also bears a stamp partly covering the payment stamp of "Apr 9 1923."

The payment stamps on both stub and receipt bear the initial "A." The ledger card of privilege number 1426 contains no entry of any receipts during the year 1923. Stub number 9997 was produced from the records of the department and bears the addressographic name of Mrs. Elizabeth Schaefer, Kahala, Honolulu, privilege number 7473. Mrs. Schaefer's name was crossed out and the name of Mrs. Amelia Fisher placed instead thereof. These items correspond with the cash entry of $4.20 and the payment stamp thereon bears the initial "A." One witness testified that only the figures "$4.20" were in the handwriting of the defendant; another that all of the handwriting on the stub was that of the defendant. The ledger card of this same privilege, in the handwriting of the defendant, contains a correct statement of the items contained in the stub. Privilege number 10518 is that of William Lau Lee, Waialae Road, Honolulu. His ledger card was produced and contains an entry under date of January, 1923, of $9.25 for flat rate in advance and $3 for labor and material, totaling $12.25, and under date of July, 1923, $5.75 for flat rate in advance, totaling $5.75. Both items are entered as paid on August 6, 1923, on stub number 7407. All of these entries are in the handwriting of the defendant. The stub produced by the department and the receipt produced by the consumer correspond as to items except that the stub contains the stub number 7407 and the receipt the stub number 7437. All handwriting contained in stub and receipt is that of the defendant. The payment stamp on both receipt and stub bears the initial "A." The entries of receipts in the cash book under date of May 25, 1923, total $359.48 and a duplicate deposit slip in the handwriting of the defendant shows that that amount was deposited in the treasury of the city and county on that day. The cash book contains but eight items of receipts on May 25, 1923. One

of these items was the sum of $222.21, which according to the evidence was paid to the defendant himself in cash. The duplicate deposit tag for that day, in the handwriting of the defendant, discloses that only $59.81 (silver and currency) was deposited. All of the entries in the cash book under dates of August 6, 1923 (47 items in all), April 24, 1923 (35 items in all), and May 25, 1923 (8 items in all), are in the handwriting of the defendant.

In the instant case we have the same number referring to two separate and distinct receipts for the payment of water rates. The receipt issued to K. Kuwada is numbered 7472. The receipt issued to J. O. Carlson is also numbered 7472. This is not in accordance with but contrary to the system employed in the Honolulu water works and sewer works department. Each receipt should have a separate and distinct number. This may result from accident. While an automatic numbering machine when properly set ordinarily functions correctly its parts may from long continued use become worn and the machine jam and skip a number and when discovered the omitted number might properly be applied to a subsequent receipt and the numerical succession thereby preserved. This appears to have occurred in the water works department. This is not, however, a case of the numbering machine jamming and skipping a number. Were that the case there would not be two receipts bearing the same number. The subsequent receipt would merely bear the omitted number. The occasion of one number referring to two separate and distinct receipts might result from the numbering machine's failing to throw into place the next succeeding number. Or a stub might be innocently misplaced or accidentally lost and upon the assumption that the numbering machine had jammed and skipped a number the number of the missing stub might again be applied to a subsequent receipt.

These are all mistakes, however, that would be sooner or later discovered. The state of the cash on hand at the close of the day would show up any discrepancy that might exist. On the other hand the occasion of one number referring to two separate and distinct receipts might result from design. A stub might be wilfully removed from the file and another stub with the same number substituted in its place and if the records showed that the cash represented by the removed stub was not accounted for it is reasonable to infer that such substitution was made for the purpose of covering up the removal of the stub and the conversion of the corresponding amount of cash. The evidence abundantly sustains the inference that this was done in the instant case. The stub of the receipt given to K. Kuwada could not be found in the records of the department. Unquestionably it had been removed by someone having access to those records. The number of that receipt was 7472. There was produced from the records of the department a stub of a receipt bearing the same number (7472). From the evidence tending to prove other and prior similar offenses it is apparent that the conversion of funds of the Honolulu water works was systematically covered up by the extraction from the records of the stub representing the amount covered and the substitution of another stub in its place with the same number. Moreover, the evidence abundantly sustains a finding that this defendant made the substitution in this case. The payment stamp on the substituted receipt bears the initial "A," the initial employed by the defendant to identify the stubs of receipts given by him. The evidence also sustains the finding that such substitution was knowingly made by the defendant. The receipt bearing the stub number 7472 given to K. Kuwada bears the payment stamp with the initial "A," the initial employed by the defendant to

identify receipts given by him. The ledger card of K. Kuwada bears the entry of the amount paid by K. Kuwada and the date of payment in the handwriting of the defendant. The inference is inevitable that when the defendant made out the receipt to Mr. Carlson he knew that the stub number 7472 had already been used on the receipt given to K. Kuwada. It was not a case of an innocent dupe acting upon the pretext or suggestion of a coemployee that the number 7472 had been omitted and the innocent application by the defendant of the omitted stub number to a subsequent receipt. The time marks indicated in the payment stamps on the stubs produced for August 13 are significant. As stated, the first, number 7470, was carried over from the previous day; the next, number 7471, the stub of the first receipt actually given on that day, bears the time mark "8-43 AM;" the next, number 7473, bears the time mark "9-23 AM." The payment stamps of 7471, 7473, 7474, 7475 and 7476 all bear the initial "A," and the time mark of number 7476 is "10-18 AM," showing that the defendant was the only one receiving water rates between 9:23 A. M. and 10:18 A. M. The substituted stub bearing the number 7472 bears a time mark of "12-14 PM," which, if stamped in the chronological order of receipt, should have borne the number of 7483. Stub number 7482 bears the time mark of "11-16 AM" and stub number 7483 bears the time mark of "12-51 PM." In other words, the substituted stub number 7472 was used by the defendant during the noon hour after he had returned from lunch and certain of the other employees were absent to cover up the absence of the stub of Kuwada which he had previously removed from the file.

Not alone is the evidence sufficient to sustain a finding that the defendant knowingly substituted the stub of the receipt given to J. O. Carlson in the place and stead of

the stub of the receipt given to K. Kuwada but that he also converted the moneys of the Honolulu water works represented by the receipt given to K. Kuwada. It was the duty of the defendant to keep the cash book. All of the entries referred to in the evidence are in the handwriting of the defendant except where the stub number is entered with a numbering machine. The defendant entered the receipts for August 13, 1923, entering the amount of the Carlson stub as the only amount received upon stub number 7472. Although he knew that he had received $77.35 from K. Kuwada he failed to enter the same and upon the close of the day he made his deposit with that amount omitted. Finally, the evidence is sufficient to sustain a finding that the amount of the Kuwada receipt was converted fraudulently. A wrongdoer is presumed to intend the natural and probable consequences of his act. By the manipulations of the defendant, knowingly and wilfully executed by him, the City and County of Honolulu was deprived of the water rates paid by Kuwada. If this were not enough the ledger card of K. Kuwada furnishes additional evidence of the fraudulent intentions of the defendant. The stub number entered by the defendant in Kuwada's ledger card in connection with the receipt of $77.35 on August 11, 1923, is given as number 7405. Stub number 7405 is the stub of a receipt given to Annie Kauwe on August 6, 1923. Although the evidence discloses that the auditor of the city and county did not check the ledger cards but that his audit was confined to checking the stubs of the department against the cash book it is apparent that this false entry was made to further confuse the records and render more difficult the discovery of the defendant's defalcations.

We deem it unnecessary to comment upon the evidence adduced in support of prior similar offenses further than

the substituted receipt given in the Ahin case. It will be remembered that the payment stamp on the stub of this substituted receipt bears the initial "P," the identifying initial of Dan Pahu, the chief clerk. Mr. Pahu was convicted of embezzlement of Honolulu water works funds and perhaps he had been indulging in the same system employed by the defendant. In any event, this evidence together with all of the other evidence in the case was open to the inference that if Pahu and not the defendant converted the moneys represented by the Ahin receipt the defendant aided and abetted Pahu in such conversion and equally with Pahu was guilty as principal.

(4) Defendant claims that the judge presiding at the trial commented upon the credibility of the evidence of the defendant in violation of the provisions of R. L. 1925, s. 2426, which prohibits the judge presiding at any jury trial from commenting upon the character, quality, strength, weakness or credibility of any evidence submitted, or upon the character, attitude, appearance, motive or reliability of any witness sworn in the cause. The instruction complained of is as follows:

"Instruction No. 10. The court instructs the jury, as a matter of law, that in this Territory one accused and on trial charged with the commission of a crime may testify in his own behalf, or not, as he pleases. You are instructed that when a defendant does testify in his own behalf, then you have no right to disregard his testimony merely because he is accused of crime; that when he does so testify he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness; and in determining the degree of credibility that shall be accorded to his testimony the jury have a right to take into consideration the fact that he is interested in the result of the prosecution, as well as his demeanor and conduct upon the witness stand; and the jury may also take into consideration the fact, if such is the fact, that he has been corroborated or contradicted by credible evidence

or by facts or circumstances in evidence. People v. Scarbak, 245 Ill. 435; See Aldrich v. People, 224 Ill. 622, 7 L. R. A. (NS) 1149; 155 Am. St. Rep. 166; 8 Ann. Cas. 284; Siebert v. People, 143 Ill. 571; Rider v. People, 110 Ill. 11; Hirschman v. People, 101 Ill. 568; Moore v. People, 92 Ill. App. 137, Aff'd 190 Ill. 331."

There were three instructions given by the court upon the credibility of witnesses. At the outset the court instructed the jury that it was the exclusive judge of the facts and credibility of witnesses. This was repeated in a later instruction to the effect that it was the exclusive judge of the credibility of the witnesses, of the weight of the evidence and of the facts in the case. It was further touched upon in the charge of the court upon the credibility of witnesses generally. The general instruction is as follows:

"Instruction No. 9. The court further instructs you, gentlemen of the jury, that you are the exclusive judges of the credibility of the witnesses, of the weight of the evidence, and of the facts in this case. It is your exclusive right to determine from the appearance of the witnesses on the witness stand, their manner of testifying, their apparent candor or frankness, or lack thereof, which witness or witnesses are more worthy of credit, and to give weight accordingly. In determining the weight to be given the testimony of the witnesses you are authorized to consider their relationship to the parties, if any, their interest, if any, in the result of this case, their temper, feeling or bias, if any has been shown, their demeanor on the witness stand, their means and opportunity of information, and the probability or improbability of the story told by them. If you find and believe from the evidence that any witness in this case has knowingly and wilfully sworn falsely to any material fact in this trial or that any witness has knowingly and wilfully exaggerated or suppressed any material fact or circumstance in this trial for the purpose of deceiving, misleading or imposing upon you, then you have a right to reject the entire testimony of such witness except insofar as the same is corroborated by other credible evidence or believed by you to be true."

In the absence of limitation to the contrary it has been held generally to be proper in criminal cases for the court to charge the jury that in weighing the evidence of the defendant the jury might take into consideration the interest of the defendant in the outcome of the case. (*People* v. *Cronin,* 34 Cal. 191, 204 (finally disapproved in *People* v. *Maughs,* 86 Pac. (Cal.) 187); *Wilkins* v. *State,* 13 So. (Ala.) 312; *Prior* v. *Territory,* 89 Pac. (Ariz.) 412; *Halderman* v. *Territory,* 60 Pac. (Ariz.) 876, 878; *Vaughan* v. *State,* 24 S. W. (Ark.) 885, 887; *Gankyo Mitsunaga* v. *People,* 129 Pac. (Colo.) 241, 244; *Robertson* v. *State,* 60 So. (Fla.) 118, 119; *McIntosh* v. *State,* 51 N. E. (Ind.) 354, 356; *State* v. *Walker,* 110 N. W. (Ia.) 925, 928; *State* v. *Killion,* 148 Pac. (Kans.) 643, 647; *People* v. *Rich,* 94 N. W. (Mich.) 375, 377; *State* v. *Ames,* 96 N. W. (Minn.) 330, 334; *State* v. *Hyder,* 167 S. W. (Mo.) 524, 525; *Keating* v. *State,* 93 N. W. (Neb.) 980, 981; *People* v. *Crowley,* 6 N. E. (N. Y.) 384, 385; *State* v. *Burton,* 90 S. E. (N. C.) 561, 563; *Commonwealth* v. *Orr,* 20 Atl. (Pa.) 866, 867; *Cooper* v. *State,* 138 S. W. (Tenn.) 826, 836; *Emery* v. *State,* 78 N. W. (Wis.) 145, 154.) It is obvious that instruction number 9 no less than instruction number 10 advises the jury that in determining the weight and credibility of the evidence of the defendant it might take into consideration the interest that the defendant has in the outcome of the case. It is true that instruction number 9 only inferentially does so but the effect of the language employed is the same in both instructions. A general instruction to the effect that the jury in weighing the evidence of witnesses may take into consideration their interest or lack of interest, if any, in the result of the case is one that is commonly given and has been approved by this court in the case of *Ward* v. *I.-I. S. N. Co.,* 22 Haw. 488. At the same time the *Ward* case held that the trial

court properly refused an instruction requested by the defendant that the jury had the right in weighing the testimony of the plaintiff and in determining how much credence was to be given to it to take into consideration the fact that he was the plaintiff and directly interested in the result of the suit. Had the court refused to give instruction number 10 and were such refusal before us upon review we would unhesitatingly follow the *Ward* case. Assuming that the giving of instruction number 10 was error it does not necessarily follow that it was prejudicial and reversible error entitling the defendant to a new trial. In the case of *Territory* v. *Truslow*, 27 Haw. 109, the trial court charged the jury that "in considering the testimony of the defendant" it might do so "in the light of the fact that he" was "the defendant and the interest that he" had "in the verdict," and this court held that under the circumstances of that case the giving of such instruction was not reversible error. No more so do we believe that the giving of instruction number 10 was reversible error under the circumstances in this case. It is a correct statement of the law. The only objection to it is that it gave undue prominence to the defendant's testimony. Under instruction number 9, however, the prosecuting officer had a right in summing up to comment upon the credibility of the defendant's evidence and to call to the attention of the jury that it was entitled to take into consideration the interest which the defendant had in the outcome of the case. The only additional element resulting from the giving of instruction number 10 was that the court itself told the jury that it might take into consideration the interest of the defendant in determining the credibility of his evidence. We do not believe that this additional element was prejudicial to the defendant. In considering the exception to the verdict we were concerned alone with the question of whether or not the ver-

dict was sustained by the evidence. In considering whether or not the error is prejudicial we are justified in considering the weight of the evidence. Review of the evidence leaves no reasonable doubt of the defendant's guilt. He had no defense. He could give no explanation of the presence of duplicate receipts nor the omission of the one representing a cash shortage from the entries in the cash book of the department. His energies seem to have been primarily directed to convincing the jury that upon occasions the numbering machine jammed and skipped a number, which had no application to the facts. The verdict is so well supported by the evidence in the absence of any showing of prejudice we are not disposed on this ground alone to disturb the judgment. (*Wilkins v. State*, 13 So. (Ala.) 312; *State v. Skaggs*, 133 N. W. (Ia.) 779; *State v. Vickers*, 106 S. W. (Mo.) 999; *Dixon v. State*, 64 N. W. (Neb.) 961.)

All of the exceptions alleged have been carefully examined and found to be without merit. They are accordingly overruled.

*W. H. Heen*, City and County Attorney (*E. K. Massee*, Deputy City and County Attorney, with him on the brief), for the Territory.

*A. M. Cristy* (*Brown, Cristy & Davis* on the briefs) for defendant.

#### DISSENTING OPINION OF PERRY, J.

In instruction No. 9 the jury was told that "in determining the weight to be given the testimony of the witnesses you are authorized to consider their relationship to the parties, if any, their interest, if any, in the result of this case, their temper, feeling or bias," etc.; and in No. 10 it was instructed that "in determining the degree of credibility that shall be accorded to his testimony" (defendant's) "the jury have a right to take into consid-

eration the fact that he is interested in the result of the prosecution as well as his demeanor and conduct upon the witness stand," etc. R. L. 1925, section 2426, which has been the law in this jurisdiction at least since 1892, provides as follows: "Jury exclusive judges of facts. The jury shall in all cases be the exclusive judges of the facts in suits tried before them, and the judge presiding at any jury trial * * * shall in no case comment upon the character, quality, strength, weakness or credibility of any evidence submitted or upon the character, attitude, appearance, motive or reliability of any witness sworn in a cause." It is well settled that this provision applies in criminal cases as well as in civil cases. This command of the legislature was violated in the case at bar. The trial judge's reference to "the fact" that the defendant "is interested in the result of the prosecution" is a finding of fact and a comment thereon. It is true that it is a fact that was well known to all of the jurors. It must have been entirely obvious to them without any comment from the court that the defendant was deeply interested in the result of his trial. It was an entirely unnecessary comment. The law is undoubtedly that the jury is justified in any criminal case in taking into consideration the interest of the defendant in the trial but that law was sufficiently called to the attention of the jury when it was instructed generally as it was in instruction numbered 9. The mere fact that an instruction is unnecessary or is a comment upon an obvious fact would not justify a reversal of the verdict; but when, as in the case at bar, the instruction is in effect a singling out of the defendant for an adverse comment from the bench it becomes unfair to the defendant, although, of course, not so intended by the presiding judge, and is cause for a reversal and the granting of a new trial.

While the evidence in this case was sufficient to sustain

a finding that it was the defendant who embezzled the moneys in question, it was also susceptible of a finding by the jury that it was not the defendant who pocketed the money but that it was one of the other employees of the same office. Any recital in detail of the evidence which to my mind justifies this view would necessarily be lengthy, owing to the peculiar nature of the case. Such a lengthy statement in a dissenting opinion cannot serve any useful purpose. It is sufficient to say that, in my opinion, there was evidence tending to show that it might have been Pahu, the clerk in charge of collections of water rates, or perhaps even some other clerk in the office, who embezzled the money. And in spite of all the evidence against him, the jurors, consistently with their oaths and their duty, might have found that the defendant's acts were consistent with his innocence. The defendant denied absolutely the taking of any moneys belonging to the government. There was no direct evidence that it was he who embezzled. The evidence against him was purely circumstantial. It was evidence of a nature that was difficult, at first hearing at least, to classify and weigh logically. In my study of the case, with many days and nights in which to pursue the study, I found it difficult to correctly understand the evidence and to give each bit of evidence what seemed to me to be its proper place and weight. Our jury system does not permit of the same degree of deliberation and consideration of evidence which is permitted to appellate judges. I do not know whether the defendant is guilty or not guilty and it is not within my province to make a finding on the point, although I have reached the conclusion that the evidence was sufficient to support a conviction. When it cannot properly be said that the evidence adduced did not permit of a finding that the defendant was not guilty and when it can properly be said that twelve jurors, acting with honesty and

the desire to do their full duty to the community as well as to the defendant and within the limits of time ordinarily afforded for such decisions by them, could conscientiously have reported that the evidence did not satisfy them of the defendant's guilt beyond a reasonable doubt,—when, under these circumstances, the judge called the attention of the jury to a fact which might have led the defendant to testify falsely and at the same time failed to call to the jury's attention the fact that Pahu and other clerks were more or less under suspicion and had a somewhat similar interest in the result of the trial, it may well be that the words of the judge upon the one point and his silence upon the other had their influence upon the jury in choosing the clerk to be reported as guilty. In other words, the instruction cannot be said to have been harmless.

Some courts have, indeed, sustained similar instructions. In some, and perhaps most, of those cases there was no constitutional or statutory requirement that the jury should be the sole judge of the facts and no inhibition against the judge commenting on the evidence. I prefer the reasoning of other courts in disapproving of such an instruction under circumstances which constitute a singling out of the defendant for adverse comment.

In California, in a series of earlier cases, such an instruction was tolerated, later disapproved without reversal and subsequently disapproved with reversals. In *People* v. *Boren,* 139 Cal. 210, 215, the court, while affirming the judgment, said: "It is difficult to logically attribute the giving of any instruction whatever on the subject of defendant's testimony to anything else than a purpose to expressly disparage a witness before a jury, the very thing that a court has no authority to do in view of our constitutional provision. Justice would be more surely accomplished if no such instruction were given and

the credibility of the defendant were left entirely to the jury, as this court has often said." In *People* v. *Maughs,* 149 Cal. 253, 263, the court, after repeating its comments from *People* v. *Boren,* added: "Trial courts have been commended by this court when they have refused to give this instruction. * * * And after all this admonition, after all these cautions, the conclusion is forced upon us that when a trial judge does give this instruction to a jury, it can be with no other purpose than to throw his judicial weight into the scales against the defendant on trial before his court. For this reason, therefore, we think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our constitution and laws, as to call for the reversal of any judgment which may be rendered against him." In *Robertson* v. *Territory,* 13 Ariz. 10, 11, the court said: "While the giving of this instruction was, therefore, not error on the part of the trial court we believe that in some respects it is an undesirable instruction to be given and we recommend to the district courts that its use be discontinued." In *Erickson* v. *State,* 14 Ariz. 253, 259, all of these being cases in which similar instructions were given, the court said: "Under the laws of Arizona, defendant may testify in his own behalf, and in doing so his testimony ought not to be singled out by the trial court in its instructions and commented upon. It is true that he is greatly interested in the result of the trial; but our observation is that often the witnesses for the prosecution are actuated by motives of revenge and hatred, and in their zeal exaggerate and color their testimony. A general instruction on the credibility of witnesses will better subserve the law and the ends of justice than to single out and in a way penalize any witness because his misfor-

tunes or necessities compel him to testify in a court of justice." Motives of protection, on the part of witnesses for the prosecution, may well lead to the same zeal to exaggerate and color testimony.

Referring to the statement made in *Robertson* v. *Territory, supra,* that such an instruction was "undesirable," the court proceeded in the *Erickson* case: "Since the adoption of our constitution, we think we should go further and hold that such instruction is not only 'undesirable,' but error. Section 12, article 6, constitution of Arizona is 'Judges shall not charge juries with respect to matters of fact nor comment thereon, but shall declare the law.' Any instruction that directs the jury's attention particularly to the testimony of the defendant and authorizes them to consider its comparative weight, with an implication that its value is to be tested by a rule different from the rule applicable to the testimony of any other witness, is certainly a charge 'with respect to matters of fact.' " *Ib.,* 260.

In *Hicks* v. *United States,* 150 U. S. 442, 451, 452, the instruction owing to its circumstantiality was more objectionable than that now under consideration and yet in its essence it was an instruction that in weighing "the personal testimony of the accused" the jury should consider his interest in the case. "You are to consider his consequent motive growing out of that interest in passing upon the truthfulness or falsity of his ·statement," the jury was told *inter alia.* The Supreme Court of the United States in reviewing the trial upon a· writ of error said: "It is not easy to say what effect this instruction had upon the jury. .If this were the only objectionable language contained in the charge, we might hesitate in saying that it amounted to reversible error. It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices; and, perhaps,

a judge cannot be considered as going out of his province in giving a similar caution as to the testimony of the accused person." (In the federal courts the trial judges, in charging juries, are not under any such inhibition as is provided for in our statute against comments on the evidence.) "Still it must be remembered that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is that 'the person charged shall, at his own request, but not otherwise, be a competent witness.' The policy of this enactment should not be defeated by hostile comments of the trial judge whose duty it is to give reasonable effect and force to the law." *Ib.,* 451, 452. In *State* v. *Hyder,* 167 S. W. (Mo.) 524, 525, 526, the court, while affirming the judgment, commented unfavorably upon an instruction of this nature. The writer of the opinion said: "This form of instruction has been severely criticized by different members of this court in several cases. * * * Speaking for myself, I seriously doubt if it was the intention of the legislature, when it enacted section 5242, R. S. 1909, to authorize courts to single out and direct the attention of juries to the evidence of such witnesses as the court may think are personally interested in the result of the trial—it sounds too much like singling out certain evidence for special comment. The instruction does not tell the jury how much discredit is cast upon the evidence of defendant or his wife by the fact that they are interested in the result of the trial. To my mind the instruction is of little or no value to the state, for it would

be a very unsophisticated jury, indeed, which would not intuitively know that the defendant and his wife would be prone to color their evidence in favor of the defense, while a witness possessing no interest would be likely to give a more fair and impartial narrative of the facts. A jury need not be treated like a primary class in a public school." In *State* v. *King,* 64 So. (La.) 1007, 1009, the court gave rather elaborate consideration to a similar instruction. It said, *inter alia*: "Whether a particular witness has a greater or less interest than another in the outcome of any given criminal prosecution is a question of fact, the determination of which, and the application of the fact, when ascertained, to the determination of the question of the credibility of the witness, are confided, with all other questions of fact, exclusively to the jury." (There was a statute in Louisiana similar to our section 2426.) "If, then, the judge is required to abstain, and is prohibited, from recapitulating the evidence, or stating the testimony, or giving any opinion, lest he influence the jury in its finding of a particular fact, a fortiori is he required to abstain, and is he prohibited, from assuming such fact, and upon the basis of that assumption, instructing the jury of the particular effect which should be attributed to it. It has sometimes been said that an intelligent jury will know, without being reminded by the judge, that the defendant in a criminal case, who testifies in his own behalf, is an interested witness, and hence that an instruction to that effect is harmless, even though he be particularly designated. But a jury, whether intelligent or otherwise, may, in a particular case be impressed with the idea that the prosecuting witness is the real criminal, and is interested in convicting the defendant in order to save himself, or, that other state witnesses are sufficiently interested, for other reasons, to induce them to commit perjury, and if, in either case, the judge, being

differently impressed, should instruct the jury to consider the interest of the defendant in determining the question of his credibility, and should say nothing of the interest or credibility of the other witnesses, he would thereby in all probability influence the jury in the finding of the ultimate and controlling facts of the case. Again, the interest of the defendant in such case being obvious, whilst the possible interest of the adverse witnesses is usually not, so, it would seem that if, under our law, the judge were authorized to interfere at all, his aid would be more useful were he to call the attention of the jury to the possible interest of the latter than to the obvious interest of the former. His action in that respect could, however, have no other purpose or effect than to influence the finding of the jury upon a question of fact; and, if it would be incompetent for him to lead the jury to a finding, or to an application, of the fact of the interest of an adverse witness, it would be equally incompetent for him, by assuming the obvious fact of the defendant's interest, to lead the jury to the application of that fact to the question of defendant's credibility, and would be all the worse because to call attention to that which is obvious attributes to it a degree of importance which it might not otherwise possess." All of this is applicable and forceful, in the light of the evidence, in the case at bar.

"His own testimony may be the only shield of an innocent person. A defendant has the right to submit his testimony to the jury to be judged of by it, uninfluenced by any suggestions of its probable falsity or an authorization to the jury to throw it aside as unworthy of belief because of the strong temptation of the defendant to swear falsely. There is little danger that juries will be unduly influenced by the testimony of defendants in criminal cases. They do not need any cautioning against too ready credence to the exculpation furnished by one on trial for a

felony.　The accused should be allowed to exercise his right to testify unimpaired by any suggestions calculated to detract from its value in the estimation of the jury." *Buckley* v. *State,* 62 Miss. 705, 707.

In *Territory* v. *Truslow,* 27 Haw. 109, cited by the prosecution in the case at bar in support of the instruction as given, "the only witness involved in the question of credibility was the defendant;" and it was held that "for the court to have instructed the jury upon the credibility of the evidence of the prosecution which the defendant had in terms admitted would have been to stultify itself," that a general instruction with reference to the interest of witnesses could not have been applicable to any witness other than the defendant and that, therefore, the direct instruction referring to the credibility of the defendant himself was not erroneous or prejudicial.　The actual decision in that case went no further.　If there are any general expressions in the opinion which are in conflict with the views now expressed by me, to that extent I think that the former decision should not be followed.

In my opinion the verdict should be set aside and a new trial should be granted.